## Commonwealth ex rel. Lund v. Sheriff of Crawford County

*Charles A. Margiotti* and *John I. Kent*, for relator.

*Stuart A. Culbertson*, district attorney, and *Wesley B. Best*, for respondent.

KENT, P. J., August 12, 1931.—On May 26, 1931, the following information, duly verified by oath, was lodged with Ralph A. Schrubb, alderman in and for the Fourth Ward of the City of Meadville, Pa.:

"Crawford County, ss:

"Before me, the subscriber, an alderman in and for the county of Crawford, personally came Joseph F. Schmidt, who upon oath duly administered according to law, deposes and says, that at Summerhill Township in the County of Crawford, on Sunday, the 24th day of May, 1931, the defendants, Louis Kaufman, C. Harrison Lund, Henry Cornell, alias Blackie Cornell, Thomas Shock and Frank Girardot, did wilfully, maliciously and feloniously set fire to, burn and cause to be burned, and did wilfully, maliciously and feloniously aid, counsel and procure the burning of a certain barn on the premises in said township, the same being parcel thereof and belonging to and adjoining a dwelling house situate on said premises, being the property of Thomas Shock, contrary to the form of the act of assembly in such case made and provided and against the peace and dignity of the Commonwealth of Pennsylvania. Complainant therefore prays and desires that a warrant may issue and the defendants may be arrested and held to answer the above charge. And further saith not,"

wherein the said named defendants were charged with the felony of arson.

This information, as we conclude, was prepared under the terms and conditions of the Act of April 25, 1929, P. L. 767, wherein it is provided:

"That any person who willfully and maliciously sets fire to, or burns or causes to be burned, or who aids, counsels or procures the burning of any dwelling house or any kitchen, shop, barn, stable or other outhouse, that is parcel thereof, or belonging to or adjoining thereto, whether the property of himself or of another, shall be guilty of the felony of arson. . . ."

The alderman's transcript filed in the court of quarter sessions at No. 30, September Sessions, 1931, discloses that on May 26, 1931, a warrant of arrest founded upon the above-recited information was issued to Harry J. Schrubb, Constable, and on the same date, to wit, May 26, 1931, defendants, Louis Kaufman, Henry Cornell, alias Blackie Cornell, Thomas Shock and Frank Girardot, were arrested by virtue of the said warrant and taken before the said alderman; on May 27, 1931, relator was arrested by virtue of the said warrant and taken before the said alderman, where he entered a plea of "not guilty" to the offense charged, hearing being fixed for June 3, 1931, at 11 o'clock A. M., and bail required in the sum of $5000, which was furnished.

On June 3, 1931, hearing was continued to June 13, 1931, at 10 o'clock A. M., bail being continued. On June 13, 1931, after hearing had, relator, C. Harrison Lund, was held to the next term of the court of quarter sessions and oyer and terminer and committed to jail. Whereupon C. Harrison Lund presented his petition in the Court of Common Pleas of Crawford County, averring:

"That the evidence produced before the said justice of the peace was insufficient to warrant the said binding over of the said relator, by reason whereof the relator avers that he is illegally and unlawfully restrained of his liberty, and, therefore, prays your honorable court to issue a writ of habeas corpus, agreeable to the acts of assembly in such case made and provided, and to release your petitioner from the custody of the respondent above named," with the following order being entered by the court:

"And now, to wit, June 13, 1931, writ awarded returnable June 20, 1931, at 10 o'clock A. M., and relator is released upon bail in the sum of five thousand ($5000) dollars, conditioned for his appearance at that time.

"Per Curiam,      O. CLARE KENT, Judge."

On June 20, 1931, by agreement of counsel, the hearing was continued to Saturday, June 27, 1931, at 10 o'clock A. M., relator's bond being forfeited, to be respited upon his appearance at the time fixed for continued hearing.

On June 27, 1931, hearing was had upon the said writ, the parties being represented by counsel, and a great amount of testimony taken, a considerable amount of which, in our judgment, is wholly irrelevant and immaterial in relation to the questions now before us for determination in this proceeding.

The writ of habeas corpus was designed to relieve persons illegally restrained of their liberty. It was not intended to apply to those who were held to bail to answer. The early practice, therefore, was, upon a hearing, merely to ascertain that an offense was charged and that the proceedings were regular. The uniform usage of our courts for many years has been to examine not only the proceedings but the evidence. If a crime be charged, the proceedings must be regular and the testimony tend to establish the charge. The Commonwealth is not required, as upon a trial, to show the offense by proof beyond a reasonable doubt. It is enough if there be evidence sufficient to warrant the court in saying that a verdict thereon would not be without evidence to sustain it. Consequently, wherever the court would be compelled to set aside the verdict of a jury for want of evidence, the court will discharge the relator. And, further, it is not necessary that the specific complaint upon which the defendant has been arrested should be made out. If any violation of the Criminal Code appears, he will be remanded to answer such bills of indictment as the grand jury may present. As the proceedings upon habeas corpus in criminal matters are only to ascertain whether or not the charge is sustained, it can never be proper to permit the accused to introduce his defense by witnesses. He may, however, upon cross-examination, bring out

his whole explanation. To permit him to call witnesses to explain or refute the evidence against him would be to try the cause, and that is solely the province of a jury.

The question, then, for determination is: Has the Commonwealth shown facts sufficient to hold the relator to answer for any violation of law? This is purely a matter of law and fact, and as such only can the court consider it.

"On a writ of habeas corpus the court hears the Commonwealth's evidence for the purpose of ascertaining whether the defendant has committed an offense, and if there be such evidence, it is immaterial how the defendant got before the court, and it is the duty of the court to remand him to answer the charge which is brought out in the evidence at the habeas corpus hearing:" Com. ex rel. Curione v. Keeper of the County Prison, 26 Dist. R. 511.

"The object of a writ of habeas corpus is to ascertain whether the relator can lawfully be detained in custody. If sufficient ground for his detention is shown, he will not be discharged for defects in the original arrest. It is the duty of the judge to investigate fully the facts and see if any offense against the law has been committed; if convinced that there has been no infraction of it, to discharge the relator from arrest; but if it appears that an offense has been perpetrated by the party charged, which is the subject of indictment, he should be held to bail, although no oath was made before a magistrate accusing him of the crime. All of the judges of this court are ex officio magistrates, fully authorized to hold to bail or commit any one charged with crime: Com. v. Hickey, 1 Pa. L. J. 436. The court hears the Commonwealth's evidence for the purpose of ascertaining whether the defendant has committed an offense, and if there be evidence that he has done so, it is immaterial how the defendant got before the court; it is the duty of the court to remand him to answer the charge: Com. ex rel. Curione v. Keeper of the County Prison, 26 Dist. R. 511:" Com. ex rel. Finley v. Ransley, Sheriff, 26 Dist. R. 1043.

"We do not consider that the case of Com. v. Divoskein [49 Pa. Superior Ct. 614] changes the practice in our quarter sessions courts, that the hearing under a writ of habeas corpus is a hearing de novo, and that if upon such hearing it is shown that an offense against the law has been committed, it is the duty of the court to sit as a committing magistrate and hold the relator to answer for the offense shown to have been committed:" Com. ex rel. Kelly v. Superintendent of House of Correction, 22 Dist. R. 92.

"The practice upon habeas corpus in Pennsylvania has been to examine both into the regularity of the proceedings and into the evidence relied upon to hold a prisoner; and whilst the Commonwealth is not required as upon trial to show his guilt beyond a reasonable doubt, it is necessary to show sufficient to warrant the court in saying that a verdict thereon would not be without evidence to sustain it: Gerdemann v. Com., 11 Phila. 374. Consequently, wherever, assuming the evidence produced by the Commonwealth upon the hearing against the relator to be true, and to be all the evidence in the case, the court would, nevertheless, be obliged to set aside a verdict of guilty rendered thereon by a jury because of a want of evidence, the relator is entitled to be discharged. . . . It is only by assuming the relator's guilt that certain of the facts proven can be regarded as explanatory of the manner in which the crime may be supposed to have been committed, while others strongly contradict that assumption. But the question is not whether, assuming the very things to be proven, certain other matters can be explained, but whether what has been proved logically leads up to that which is to be proven:" Com ex rel. Yeager v. Warden of the Berks County Prison, 4 Dist. R. 605.

"As is universally known, the writ of habeas corpus is to relieve persons illegally restrained of their liberty. The early practice was not to free them if they were legally held, that is, if there was a crime charged and the proceedings were regular. The regularity of the proceedings and not the guilt or innocence of the accused was the question. In later years, however, our Pennsylvania courts have established the practice of examining not only the proceedings but also the evidence, and now the rule is that if a crime be charged, not only must the proceedings be regular but the testimony must tend to establish the charge, not beyond a reasonable doubt, but it must be sufficient upon which a verdict of guilty would be permitted to stand:" Com. *v.* Collins, 43 Pa. C. C. 390.

From the above decisions we conclude that upon a habeas corpus hearing the court has two questions to determine:

1. Were the proceedings regular?

2. Has the Commonwealth, by the evidence introduced, shown facts sufficient to hold the relator to answer for any violation of law, and, if so, is such evidence sufficient to warrant the court in saying that a verdict thereon would not be without evidence to sustain it?

After a careful examination of the return of proceedings in the instant case, we are satisfied that such were regular, with but possibly a single exception, which we consider of such importance as compels us to make some reference thereto.

The alderman's transcript clearly and definitely establishes the fact that on May 26, 1931, a warrant was duly issued for the arrest of the relator and other defendants therein named, viz., Louis Kaufman, Henry Cornell, alias Blackie Cornell, Thomas Shock and Frank Girardot, and that the warrant so issued was directed to Harry J. Schrubb, Constable; that by virtue thereof, defendants, Louis Kaufman, Henry Cornell, alias Blackie Cornell, Thomas Shock and Frank Girardot, were arrested, taken before the alderman May 26, 1931, where regular proceedings were had leading to their commitment; on May 27, 1931, the relator was arrested by virtue of said warrant, taken before the alderman, where regular proceedings were had leading to his commitment.

In relation to the latter arrest, that of the relator, evidence offered on the part of the Commonwealth clearly establishes that said Lund was arrested by Joseph Schmidt on May 26, 1931, at about 5.30 P. M., at his home in Erie, Pa., and taken to the state police barracks at Meadville, Pa., where he was questioned by several officers for a considerable length of time.

It is our understanding that all warrants issued for the arrest of persons charged with the commission of any crime or offense contain the explicit command that the named defendant be taken before the officer or court issuing said warrant. We find no legal authority for the taking of a defendant, after the service of a warrant, before any other body or tribunal for questioning. Such procedure, to our mind, is a most unusual practice in the administration of justice. Such practices might tend to rob a defendant of many of his legal rights. In the absence of any evidence explanatory of why this particular defendant, Lund, was so singled out and dealt with, when compared with the regular procedure followed in relation to his codefendants, we feel that we are obliged to at least call attention to, if not consider, such unwarranted and unusual practice.

Passing now to the second question involved: Has the Commonwealth, by the evidence introduced, shown facts sufficient to hold the relator to answer for any violation of law, and, if so, is such evidence sufficient to warrant the

court in saying that a verdict thereon would not be without evidence to sustain it?

After carefully reviewing the testimony, we are clearly of the opinion that there is absolutely no testimony offered on the part of the Commonwealth tending to show that the relator willfully and maliciously set fire to, burned or caused to be burned, the barn mentioned and described in the information filed before the alderman. In fact, there is no testimony offered tending to show that he was upon or any place near to the premises on the date of the alleged burning or that he personally participated in the actual burning of said barn. We, therefore, conclude that the sole question for our determination is: Did the relator in any way or to any extent willfully and maliciously aid, counsel or procure the burning of the barn, and is the evidence offered on the part of the Commonwealth sufficient upon which a verdict of guilty would be permitted to stand?

Evidence upon the part of the Commonwealth clearly discloses that on Sunday, May 24, 1931, the barn described in the information was burned. This being the fact, we turn to the evidence to ascertain whether or not the relator was in any way concerned, whether or not he willfully and maliciously aided, counseled or procured such burning.

Prior to February 18, 1931, relator owned the property upon which the barn was situate. He was desirous of selling the same, and to this end had advertised the property for sale in the newspaper. The witness, V. G. McMasters, became cognizant of relator's desire and on a particular occasion advised the witness, Louis Kaufman, thereof, who immediately opened negotiations for the purchase thereof; such negotiations being carried on to the end that on February 18, 1931, the transfer of title was completed by the delivery of deed to one Thomas Shock, he in turn giving bond and mortgage for the purchase price of $1000. Relator, being a practicing attorney, prepared the deed, and upon solicitation and under the direction of Kaufman, two mortgages were prepared, one in favor of relator in the sum of $1000 and a second in favor of V. G. McMasters in the sum of $1500, both of said mortgages containing provision for the carrying of insurance, payable in case of loss to mortgagees as their interest might appear. Relator attempted to procure insurance under the terms and conditions of the mortgage, as he undoubtedly had a right to do, writing to the firm of Gelvin, Jackson & Starr, at Meadville, Pa., in relation thereto, but failed in the undertaking. Thereafter, to wit, on April 15, 1931, McMasters procured insurance, two policies, one in the sum of $1000, with mortgagee clause in favor of relator, the other in the sum of $2700, with mortgagee clause therein in favor of himself. Immediately upon the issuance and delivery of the policies to McMasters, the $1000 policy was delivered to relator; he, in turn, immediately directed the recording of deed to Shock and the $1000 mortgage in Crawford County, which was done under date of April 15, 1931, as shown by the records.

This, so far as we are able to discover from the evidence, covers relator's personal activities and actions in the sale and transfer of the property, as well as personal participation in any scheme or plan for the burning of the barn; all other contentions on the part of the respondent in this proceeding being based upon alleged statements made by the relator at different times during the progress of the negotiations for transfer of the property, investigation and arrest of the relator in relation to the alleged burning of the barn.

The evidence shows that on some two or three occasions, possibly during the period of negotiations for the transfer of the property, and possibly before and after the insurance was obtained by McMasters, relator asked Kaufman, "When

will I get my money?" to which Kaufman replied, "If there is a fire you may get some money," to which expressions relator made no reply.

The respondent also refers to statements made by relator during the questioning, or at the close of the questioning of relator, by officers at the state police barracks on the night of May 26th, wherein reference is made to the entry of a plea of nolle contendere. Joseph Schmidt, in this connection, testifies, on direct examination, as follows:

"Q. Did you hear any conversation between Mr. Lund and the district attorney? A. Yes, I did. Q. What was that? A. When Mr. Lund got ready to go, he asked Mr. Culbertson if he would consider a plea of nolle contendere. Mr. Culbertson said, 'Yes, I think I would.' Then he talked a little bit. He said, 'Now by the time court comes around,' he said, 'I might be able to help the state,' he says. 'If I do, would you consider to nolle pros. the case?' Mr. Culbertson told him he would not nolle pros. it. He would not nolle pros. the case."

And further, in this connection, the witness Frank Allen testifies:

"He hesitated for a minute, probably two, and then he addressed you, Mr. Culbertson. He said: 'Would you consider a nolle contendere plea?' You said: 'Yes, I would.' I believe you said, 'I have accepted one before.'"

In this connection, we agree with the respondent's contention that a plea of nolle contendere, when accepted by the court, is, in its effect upon the case, equivalent to a plea of guilty. It is an implied confession of guilt only, and cannot be used against the defendant as an admission in any civil suit for the same act. The judgment of conviction follows upon such plea as well as upon a plea of guilty. But there is a difference between the two pleas, in that the defendant cannot plead nolle contendere without leave of the court. If such plea is tendered, the court may accept or decline it in its discretion: Com. v. Ferguson, 44 Pa. Superior Ct. 626.

"The plea of nolle contendere by the principal (no judgment or sentence having been imposed) is inadmissible on the trial of the accessory, either to affect the accessory or to establish the guilt of the principal. Such plea is but the equivalent of a confession by the principal which is inadmissible to affect an accessory and which may be withdrawn at any time before sentence:" Buck v. Com., 107 Pa. 486.

The distinction, as we view it, in relation to a plea of nolle contendere in the instant case and those cited upon argument, is, it is such a plea as must be allowed by the court before it can be effective. In the instant case no such plea was entered. The evidence indicates only that there was some talk relative thereto, in that the relator herein asked the district attorney if he would consider the entry of such a plea. This would not be equivalent to an entry of the plea or a confession by the relator. Wherefore we conclude that, in so far as this particular point is concerned, it cannot be considered as evidence of a confession or an admission of guilt upon the part of the relator.

After a very careful review of the testimony offered at the hearing, we are convinced that there was in existence a plan and scheme for the burning of the barn in question, and that both of the witnesses, McMasters and Kaufman, were more or less cognizant thereof, but we are unable to find any direct evidence showing, or tending to show, that relator had any personal knowledge of the plan and scheme prior to the burning, or that he had any knowledge of any scheme or plan existing among the others so to do, and when we weigh the evidence offered seeking to connect him with this plan and scheme, in connection with that of, as might be said, an accomplice, V. G. McMasters, when he testifies as follows:

"Q. In all these deals you have had, all these transactions you have had, was Mr. Lund ever connected with them? A. No, I never had deals with Mr. Lund. No. Q. Was he ever connected with any unfair or crooked deal with you or Mr. Kaufman? A. I did not know Mr. Lund was involved in this. Q. By the way, do you know Mr. Bower, the attorney? A. Sure I know Mr. Bower. Q. Didn't you call him up; didn't you talk either by telephone or talk to Mr. Bower about this property that had been sold by Mr. Lund? A. Yes, I did. I believe that was in his office. Q. Didn't you tell him there was an investigation going on out there and there was going to be a fire and a bunch was going to be arrested, but not to say anything to Mr. Lund about it at all because he was not in it in any way? A. I said something like that. I don't know as I used those words. Q. Give me your impression of what you said. A. Well, I don't know as I can repeat it much better than you gave it. Q. Then that is about the way it happened, then, in substance? A. Yes, practically, in substance. . . .

"Q. In your conversation with Mr. Bower, didn't you tell him the insurance companies had the officers working and that they were going to get a certain crowd. That everybody knew that Mr. Lund was perfectly innocent in this matter. That investigation had been made and that there was no intention to prosecute him. He said to you, 'I want to tell Mr. Lund about this.' This was long before the fire. Didn't you say, 'No, don't tell him anything about it at all, because it is not necessary. It will just worry him,' or words to that effect? A. You have about a dozen questions in there in one. Q. Give your own story. A. I have given you everything that was said. Q. We will be fair, as you call it. Just tell what you said to Mr. Bower. A. I could not repeat that conversation. I don't remember what all it was. Q. Well, in substance. A. At that time I don't think anybody figured Mr. Lund was involved in the case. Q. I am not asking what anybody figured; I am asking what you said. A. I think I told him that Mr. Lund was not involved. Q. Is that all you said? A. Mr. Bower and I talked quite a while. I don't know what all was said. Q. Don't you remember anything else was said except to say that Mr. Lund was not involved? A. Well, Mr. Bower was wanting to sell a farm of his own. We talked about that for a while. Q. Did you tell Mr. Bower the companies had officers working and were going to get this crowd? A. Yes, I did. Q. This fire-ring, as you called it? A. I think I did. I think I told him that. Q. Did you tell him that the companies, through their men, were satisfied Mr. Lund was perfectly innocent, or words to that effect? A. I believe I did at that time—Yes."

And, further, considering the testimony of Louis Kaufman in relation to the distribution of money, which is as follows:

"Q. How much was Mr. McMasters to receive out of the Lund fire? A. He was to receive one-third of the balance of the money that was received after all expenses was paid. One-third. Q. Who got the other two-thirds? A. I was supposed to get one-third and Girardot the other third."

In proceedings of this character, the evidence of the prosecution alone is heard. It has even been held that the presumption of innocence has no place in a habeas corpus proceeding. The decision, therefore, upon the questions there arising, is in no sense a decision upon the guilt or innocence of the accused person. If he is held, it is not because the court deems him guilty, but simply because the evidence produced against him, standing alone, uncontradicted, and taken for verity, makes out a prima facie case against him. If he is discharged, it is not because the court deems him innocent, but simply because a conviction upon the basis of that evidence would have to be set aside as without evidence. Clearly, where there is no direct evidence against one accused of a crime, and there is no proof of circumstances connecting him with it, there is no evidence

of the commission of the crime by him. The fact that some suspicious circumstances appear or might be drawn from the evidence is not evidence that the accused committed the crime, unless he be also connected with some leading evidentiary fact relating to the time and place or the instrument of its commission. Certainly, in the absence of anything bringing home to one the opportunity and means of committing a specific crime, the mere proof or inference of suspicious circumstances against one is not necessarily of itself evidence of complicity in it, and, to our mind, it is in this want of connection between the relator, the time and place and instrument involved in the burning of the barn, that the fatal weakness of the Commonwealth's case lies. All that has here been proven may be explained readily enough in a number of different ways, none of which would connect this relator with the crime. Of his connection with it there is no direct proof. It rests upon theory alone.

On the other hand, if the statements of the witnesses, McMasters and Kaufman, which are in evidence, are true and to be considered as a verity, they absolutely take away any supposition as to relator having any connection with the plan or scheme for the burning of this barn, as the one says that relator was in no way connected, and the other clearly testifies that he was not to receive any of the financial benefits. It seems to be beyond reason that a person of even ordinary intelligence would be in any way concerned in willfully and maliciously aiding, counseling or procuring the burning of any building without some hopes of pecuniary reward.

After considering and weighing all of the evidence the Commonwealth has submitted, we are of the opinion that there is no evidence upon which a verdict against the relator could be sustained. It is, therefore, ordered that the relator be discharged.                    From J. Perry Eckels, Meadville, Pa.